UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH RURODE, Individually on Behalf of Himself and Derivatively on Behalf of Nominal Defendant REALTY FINANCE TRUST, INC., <br><br> Plaintiff, <br><br> v. <br><br> PETER M. BUDKO and ELIZABETH K. TUPPENY, <br><br> Defendants, <br><br> and <br><br> REALTY FINANCE TRUST, INC. <br><br> Nominal Defendant. | Case No. 1:16-cv-04553 <br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED INDIVIDUAL AND SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Rurode ("Plaintiff"), by the undersigned attorneys, submits this Verified Individual and Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1. This is a shareholder action brought by Plaintiff individually, on behalf of himself, and derivatively on behalf of nominal defendant Realty Finance Trust, Inc. ("RFT" or

the "Company"), against certain members of RFT's Board of Directors (the "Board"), seeking to remedy the defendants' violations of the federal securities laws.

2. On April 29, 2016, the Company filed with the Securities and Exchange Commission ("SEC") a Definitive Proxy Statement on Schedule 14A (the "Proxy")[1] soliciting stockholder votes at the Company's annual meeting, which is scheduled for June 17, 2016 (the "Annual Meeting").[2] Defendants recommend that, at the Annual Meeting, the Company's stockholders vote to approve six amendments to RFT's Articles of Amendment and Restatement (the "Charter"). If approved, the amendments will eliminate protections for RFT stockholders in connection with the Company engaging in a "Roll-Up Transaction" (the "Roll-Up Protections"), which the Charter defines as "a transaction involving the acquisition, merger, conversion or consolidation either directly or indirectly of the Company and the issuance of securities of a Roll-Up Entity to the holders of Common Shares," if those securities have not been listed for at least 12 months on a national securities exchange.[3] Among other things, the elimination of the Roll-Up Protections will eliminate RFT stockholders' appraisal rights in connection with a Roll-Up Transaction, as well as allow the Company to pursue a Roll-Up Transaction even if it changes RFT stockholders' voting rights and rights to inspect the corporate records of the new Roll-Up Entity, which would otherwise be prohibited under the current Charter.

3. RFT's Sponsor, American Realty Capital VIII, LLC (the "Sponsor"), and its Advisor, Realty Finance Advisors, LLC (the "Advisor"), which directs or performs the day-to-day business affairs of the Company and employs the Company's executive management, are

---

[1] A true and correct copy of the Proxy is attached hereto as Exhibit A.
[2] The Proxy originally scheduled the Annual Meeting for June 9, 2016, but the Company adjourned the Annual Meeting for June 17, 2016.
[3] The Charter defines a "Roll-Up Entity" as "a partnership, real estate investment trust, corporation, trust or similar entity that would be created or would survive after the successful completion of a proposed Roll-Up Transaction."

wholly-owned or controlled by AR Global Investments, LLC ("AR Global"), which is controlled by Nicholas Schorsch ("Schorsch").  AR Global is planning a proposed roll-up of RFT, along with certain other non-traded real estate investment trusts ("REITs") into another non-traded REIT, American Finance Trust, Inc. ("AFT"), which is also controlled by AR Global (the "Planned Transaction").

4. The Board now seeks to eliminate the Roll-Up Protections through a majority stockholder vote at the Annual Meeting, but fails to disclose the Planned Transaction is the reason for the elimination of the Roll-Up Protections and what impact the elimination of the Roll-Up Protections will have on RFT stockholders' rights in connection with the Planned Transaction.  Accordingly, the Proxy's explanation for why stockholder approval is sought is materially misleading and incomplete.  Indeed, in the Proxy, defendants merely claim that eliminating the Roll-Up Protections will provide more strategic options for the Company and increased liquidity for stockholders.  Defendants do not disclose, however, that AR Global is planning a conflicted roll up of RFT into AFT, which will lock RFT into an extended 20-year advisory agreement with AFT's advisor.  Accordingly, RFT stockholders are being asked to vote to give up the very protections that would be invoked in their favor in connection with this conflicted Roll-Up Transaction, without knowing that the transaction is already in the works and their vote on the Charter amendments will extinguish rights designed to protect them from this Roll-Up Transaction.

5. Indeed, as indicated in April 26, 2016 and April 27, 2016 news reports attached hereto as "Exhibit B" and "Exhibit C" (the "News Articles"), in March 2016, before the Proxy was issued, AR Global began discussions with RFT and three other non-traded REITs, American Realty Capital – Retail Centers of America, Inc., American Realty Capital Healthcare Trust III,

-3-

Inc. ("HT III") and Healthcare Trust, Inc. ("Healthcare Trust") (collectively, the "Roll-Up REITs") to be rolled up into AFT. The public rumors of the Planned Transaction have been confirmed by disclosures by each of RFT, HT III and Healthcare Trust that they have formed special committees to explore strategic transactions and to address potential conflicts of interest in connection with a related party transaction.[4]

6. Moreover, as disclosed in an article by the Investment News on May 20, 2016, RFT's former independent director Robert J. Froehlich, also a director of Healthcare Trust, resigned his position with RFT because of certain conflicts of interest in the Proposed Roll-Up Transaction, and RFT's failure to disclose them to stockholders. *See* Exhibit G. Indeed, "on May 4, he sent an email to other members of the Realty Finance Trust board, criticizing them for not appreciating the perception of a conflict of interest in having the same executive, Nick Radesca, as chief financial officer for [Realty Finance Trust] and the other REIT, American Finance Trust, which had its name redacted in the filing." *Id*. After RFT's board of directors failed to take action in response, including "engaging a third party adviser to explore alternatives for the REIT," Mr. Froehlich resigned. *Id*. According to Mr. Froehlich: "Much to my shock and surprise, the majority of the board did not concur with my assessment, which, in my mind, calls into question the level of independence of the only other independent director and the quality of corporate governance exercised by the balance of the board of directors of [Realty Finance Trust]." *Id*. Mr. Froehlich concluded: "This is a very sad day for shareholders and an even sadder day for all the financial advisers who invested on behalf of their clients in our company because they knew . . . that I was there to protect their interests and fight for shareholder value as the lead independent of [Realty Finance Trust]." *Id*. In disclosing his resignation, RFT merely

---

[4] *See* Exhibits D (HT III's April 29, 2016 press release), E (Healthcare Trust April 22, 2016), and F (RFT's May 6, 2016 press release).

stated that Mr. Froehlich "notified the Board of his intention to resign early from the Board effective May 11, 2016, absent compliance with certain demands outside of the Board's prescribed governance processes." *See* RFT May 19, 2016 Form 8-K.

7. Defendants, thus, surreptitiously put in motion a two-step scheme designed to eliminate stockholders' Roll-Up Protections in connection with the forthcoming Planned Transaction.

8. Injunctive relief is required to prevent stockholders from being forced to vote on the elimination of their Roll-Up Protections based on the misleading and incomplete Proxy which fails to disclose that the stockholder vote is part of defendants' two-step process designed to complete the Planned Transaction without any protections in place for RFT stockholders.

9. Further, the Proxy solicits stockholders to vote on distinct and separate Charter amendments that are bundled together under a single proposal. Specifically, Proposal No. 6 bundles two separate amendments together such that Plaintiff must vote for or against them all. As such, the Proxy rids Plaintiff of his right to approve, disapprove or abstain on each separate matter intended for him to vote on in violation of the securities laws. *See* 17 C.F.R. § 240.14a-4(a)(3) and § 240.14a-4(b)(1) ("Rule 14a-4(a)(3)" and "Rule 14a-4(b)(1)," respectively).

10. Injunctive relief is required so that Plaintiff can exercise his right to vote on the separate matters bundled together in Proposal No. 6 as contemplated by Rule 14a-4(a)(3) and Rule 14a-4(b)(1) of the Securities Exchange Act.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

13. Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

14. Nominal defendant RFT is a public, non-traded REIT which was incorporated under the laws of Maryland on November 15, 2012. Its principal executive offices are located at 405 Park Avenue, 14th Floor, New York, New York 10022.

15. Defendant Peter M. Budko ("Budko"), the Chairman of the Board, has also served as RFT's interim President since March 2016 and as its Chief Executive Officer ("CEO") since November 2014. Budko previously served as a director of RFT from January 2013 through November 2014. Budko has been an executive officer of RFT and its Advisor since their formations in November 2012. Budko also works as the CEO and Chairman of AR Global-managed Business Development Corporation of America. Budko previously served as a director and officer of at least two other AR Global-managed REITs, including RCS Capital Corporation ("RCAP").

16. Defendant Elizabeth K. Tuppeny ("Tuppeny") has served as an independent director of RFT since January 2013. She is the sole member of RFT's Audit Committee. Tuppeny currently serves as a director of two other AR Global-managed REITs, including

proposed Roll-Up REIT Healthcare Trust.  Tuppeny previously served as a director of at least one other AR Global-managed REIT.  Tuppeny also served as a Trustee for Cole Credit Property Trust V, Inc., for which Schorsch served as the President, Chairman of the Board and CEO.  Tuppeny has received at least $810,000, including at least $239,000 in stock awards, for her service as a director of Schorsch-affiliated REITs in the last three years.

17.     Defendants Budko and Tuppeny are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Individual Defendants Embark on an AR Global-Managed Roll-Up

18.     AR Global and its controller Schorsch are in turmoil.  In October 2014, American Realty Capital Properties, Inc., a formerly controlled Schorsch company, revealed a $23 million accounting misstatement that was intentionally uncorrected.  According to a November 5, 2014 Bloomberg report, the accounting errors revealed by American Realty Capital Properties, Inc. "erased almost $4 billion in market value" and led "brokers to halt sales tied to Schorsch's AR Capital LLC."  The shares of another Schorsch company, RCAP, "plunged more than 40 percent since the news of the accounting issues. . . ."  RCAP then filed for bankruptcy in January 2016.

19.     AR Global has experienced similar problems.  In November 2015, AR Global's Transaction Agreement with Apollo Global Management, LLC ("Apollo") fell through.  Under the Agreement, Apollo would have purchased a majority stake in AR Global for $378 million.  Apollo and AR Global mutually agreed to terminate their agreement after Realty Capital Securities ("RCS"), the wholesale division of an AR Global-controlled public holding company, was caught engaging in proxy fraud.  News sources report that RCS' employees impersonated shareholders of Business Development Corp of America, an AR Global-managed REIT, in order to rig the affirmative shareholder vote that was a prerequisite to Apollo's purchase.  RCS

subsequently closed its business across the Country, slashing the capital that AR Global received through RCS' services.

20. Also, in November 2015, AR Global announced that it had stopped incorporating new, non-traded REITs. News sources report that AR Global stopped taking new investor money for five of AR Global's newer REITs. Because AR Global is no longer taking in any new capital as a result of its many problems, AR Global must rely on fees from its Advisory Agreements with its AR Global-managed REITs. However, those Advisory Agreements are in jeopardy.

21. On December 3, 2015, Phillips Edison Grocery Center REIT II, Inc. terminated its Advisory Agreement with AR Global. SEC filings report that the REIT paid its AR Global-controlled Advisor and its sub-advisor, collectively, at least $26.5 million under its Advisory Agreement in 2015.

22. In January 2016, RCAP, the parent of RCS, filed for bankruptcy. RCAP terminated all of its Dealer-Broker Agreements between its subsidiaries and AR Global-managed REITs.

23. On April 4, 2016, the United Development Funding Income V terminated its Advisory Agreement with AR Global.

24. SEC filings report that AR Global generated over $80 million under its Advisory Agreements with AR Global-managed REITs in 2015, including over $2.5 million paid by RFT to its Advisor, but only two of AR Global's Advisory Agreements are 20-years long. Thus, as indicated by the News Reports, AR Global is rolling up half a dozen of its REITs in order to lock in "iron-clad," "difficult to break" advisory fees of enormous scope.

25. The Planned Transaction will involve rolling the Roll-Up REITs into AFT, which has a 20-year long Advisory Agreement with its advisor that is, of course, wholly-owned by AR Global. The Planned Transaction will also involve rolling American Realty Capital Global Trust II, Inc. into Global Net Lease, Inc. Global Net Lease, Inc. has a 20-year long Advisory Agreement with its Advisor, also wholly-owned and employed by AR Global. Collectively, the Planned Transaction involves $10.5 billion in assets, which includes RFT's $144 million in assets.

26. At least one time previously, Schorsch's REITs have solicited stockholder approval to eliminate similar stockholder protections shortly before a merger announcement. On May 21, 2012, American Realty Capital Trust, Inc. ("ARCT") issued a Form DEF 14A soliciting stockholder approval to eliminate its stockholders' rights of appraisal in connection with a roll up transaction, as well as procedures governing conflicted transactions and ARCT's advisor's performance and compensation. After receiving stockholder approval of the elimination of stockholder protections on July 31, 2012, just one month later on September 6, 2012, ARCT announced its agreement to merge into Realty Income Corporation.

**The Individual Defendants Seek to Eliminate RFT Stockholders' Roll-Up Protections**

27. The Planned Transaction, whereby RFT would be rolled up into AFT, would constitute a Roll-Up Transaction under the Charter, because the transaction would involve the issuance of securities that have not been listed on a national exchange for at least 12 months. This is because both RFT and AFT are non-traded REITs. Currently, this would trigger the Roll-Up Protections set forth in Article XIV of RFT Charter, titled "ROLL-UP TRANSACTIONS," which states:

    (i)     In connection with any proposed Roll-Up Transaction, an appraisal of all of the Company's assets shall be obtained from a competent Independent Appraiser. The Company's assets shall be appraised on a consistent basis, and the appraisal

        shall be based on the evaluation of all relevant information and shall indicate the value of the assets as of a date immediately prior to the announcement of the proposed Roll-Up Transaction . . . A summary of the appraisal, indicating all material assumptions underlying the appraisal, shall be included in a report to Stockholders in connection with a proposed Roll-Up Transaction.  In connection with a proposed Roll-Up Transaction, the person sponsoring the Roll-Up Transaction shall offer to holders of Common Shares who vote against the proposed Roll-Up Transaction the choice of:

        (a)    accepting the securities of a Roll-Up Entity offered in the proposed Roll-Up Transaction; or

        (b)    one (1) of the following:

            (I)    remaining as Stockholders of the Company and preserving their interests therein on the same terms and conditions as existed previously; or

            (II)    receiving cash in an amount equal to the Stockholder's pro rata share of the appraised value of the net assets of the Company.

    (ii)    The Company is prohibited from participating in any proposed Roll-Up Transaction:

        (a)    that would result in the holders of Common Shares having voting rights in a Roll-Up Entity that are less than the rights provided for in Article XI hereof;

        (b)    that includes provisions that would operate as a material impediment to, or frustration of, the accumulation of shares of stock by any purchaser of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity), or which would limit the ability of an investor to exercise the voting rights of its securities of the Roll-Up Entity on the basis of the number of shares held by that investor;

        (c)    in which investor's rights to access of records of the Roll-Up Entity will be less than those described in Sections 11.5 and 11.6 hereof; or

        (d)    in which any of the costs of the Roll-Up Transaction would be borne by the Company if the Roll-Up Transaction is rejected by the holders of Common Shares.

    28.    Accordingly, in the event of a Roll-Up Transaction, such as the Planned Transaction, the Charter imbues two levels of protection on RFT stockholders.  The first relates to RFT stockholders' appraisal rights in connection with a Roll-Up Transaction.  Here, the

Charter requires that in connection with any proposed Roll-Up Transaction an Independent Appraiser shall conduct an appraisal of the Company. The Charter defines an Independent Appraiser as a "Person with no material current or prior business or personal relationship with the Advisor or the Directors." Company stockholders must then receive a summary of the Independent Appraiser's report. Following receipt of the Independent Appraiser's report, in the event that a stockholder votes against the proposed Roll-Up Transaction, the stockholder must be given the choice between remaining an RFT stockholder with identical interests and rights or receiving his *pro rata* share of the Company's appraised value in cash.

29.   The Roll-Up Protections are derived from the North American Securities Administrators Association's Statement of Policy Regarding Real Estate Investment Trusts, as revised (the "Guidelines"). Because RFT was offering investments to stockholders throughout the country, the Company was required by state securities administrators to include these valuable protections to prevent abuse by REIT controllers and to mitigate risks associated with holding shares in a non-traded company. However, now that AR Global has stopped offering new investment in RFT, RFT is no longer required to comply with the Guidelines.

30.   The clear purpose of the Roll-Up Protections is to ensure that an investor who is investing in a particular real estate asset base is not required to have their investment exchanged to incorporate other assets that they did not choose to invest in. That is why there is optionality, following an independent appraisal, to permit RFT stockholders to remain invested solely in the assets of RFT or to receive their *pro rata* cash share of the appraised value of RFT's assets and exit their investment. However, the Proxy states that, if Proposal No. 6 to amend the Charter is adopted, then Article XIV of the Charter would be deleted entirely from the Charter, removing all appraisal related protections for RFT's stockholders in a Roll-Up Transaction.

31.     In the absence of these protections, RFT will not have to bring in an Independent Appraiser in connection with the Planned Transaction to tell RFT stockholders what the fair value of RFT's assets are, and RFT stockholders will no longer have the options of remaining invested solely in RFT's assets or taking the cash value of their shares and exiting their investment.  Instead, stockholders will only have the right to approve or disapprove the Planned Transaction and stay invested in RFT or become a stockholder in AFT.  This will significantly reduce RFT stockholders' information concerning the Planned Transaction and their leverage to ensure that the terms offered in the Roll-Up Transaction are fair.

32.     The second level of protections that are removed by Proposal No. 6 to amend the Charter relate to RFT's ability to even pursue a Roll-Up Transaction.  Under subsection (ii) of Article XIV of the Charter, RFT cannot pursue a Roll-Up Transaction if RFT stockholders would have different voting rights or would no longer have the right to inspect the books and records of the new Roll-Up Entity.  These are important protections that will be affected in the Planned Transaction as, at a minimum, RFT stockholders will not have inspection rights in AFT and may have their voting rights changed in connection with the Roll-Up Transaction.  Accordingly, without the Charter amendments being passed, it would be impossible for AR Global to pursue its roll up plan, because RFT would be prohibited from engaging in such a transaction.

<b><u>The Individual Defendants Issue an Incomplete and Misleading Proxy<br>
to Facilitate the Elimination of RFT Stockholders' Roll-Up Protections<br>
so as to Permit the Planned Transaction to Proceed</u></b>

33.     The Proxy is replete with material misstatements and omissions concerning the effect the proposed amendments will have and the Board's bases for proposing them.

34.     The Proxy fails to provide any information regarding AR Global's planned Roll-Up Transaction.  Instead, the Proxy misleadingly and incompletely explains on page 35 that:

> [The Roll-Up Protections] provide[] that prior to conducting a roll-up transaction, we would be required to obtain an appraisal of the Company's assets. In addition, as part of the roll-up transaction, we would be required to provide stockholders certain rights including the right to remain as a stockholder of the Company and preserve their interests therein on the same terms and conditions as existed previously, or to receive cash in an amount equal to the stockholders pro rata share of the appraised value of the net assets of the Company, even if the Board of Directors concludes that transaction would be in the Company's best interests. We believe deleting [the Roll-Up Protections] will increase our flexibility and allow greater optionality for the Company, including but not limited to the possibility of strategic transactions that could otherwise be difficult given the existing provisions, such as a transaction with another entity whose securities have not been listed on a national securities exchange for at least 12 months. These provisions are also potentially ambiguous and may limit the ability to engage in a transaction involving our securities if our securities have not been listed on a national securities exchange for at least 12 months among other substantive transactional requirements. The Board of Directors believes that deleting this provision will provide us with greater options to pursue a transaction that will provide our stockholders with liquidity.

35. However, the Proxy does not disclose that stripping RFT stockholders of their Roll-Up Protections will facilitate an AR Global-managed Roll-Up Transaction on terms likely to AR Global's liking because stockholders will no longer have the benefit of an automatic, independent appraisal of the fair value of their *pro rata* shares which stockholders can use to assess the fairness of the Planned Transaction consideration.

36. The Individual Defendants' incestuous relationship with AR Global clearly caused the Individual Defendants to make incomplete and misleading disclosures concerning the impending Planned Transaction and the effect that the elimination of the Roll-Up Protections will have on AR Global's ability to consummate the Planned Transaction on terms of its liking.

37. The Proxy is, thus, replete with materially incomplete and misleading disclosures, which unlawfully deprives stockholders of their right to cast a fully informed vote at the Annual Meeting.

### The Proxy Impermissibly Bundles Separate Matters in Violation of Rules 14a-4(a)(3) and 14a-4(b)(1)

38. The Individual Defendants caused the Proxy to be issued in a manner that bundles separate matters together in violation of Rules 14a-4(a)(3) and 14a-4(b)(1) of the Securities Exchange Act.

39. Proposal No. 6 solicits RFT stockholders to approve two separate amendments to the Charter, including: (1) creating an exception to the investment limitations contained in Section 9.3 to permit the Independent Directors to override the Company's investment limitations, and (2) eliminating Article XIV, RFT's Roll-Up Protections.

40. Because Proposal No. 6 impermissibly bundles these two different proposed amendments, Plaintiff must accept or reject them collectively in violation of his rights under SEC Rules 14a-4(a)(3) and 14a-4(b)(1).

41. SEC Rule 14a-4(a)(3) provides:

(a) The form of proxy . . .

(3) Shall identify clearly and impartially each separate matter intended to be acted upon, whether or not related to or conditioned on the approval of other matters…

§ 240.14a-4(b)(1).

42. SEC Rule 14a-4(b)(1) provides:

Means shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to each separate matter referred to therein as intended to be acted upon . . .

§ 240.14a-4(b)(1).

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

43. Plaintiff brings this action derivatively for the benefit of RFT to redress the Individual Defendants' derivative violations of the federal securities laws.

44. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

45. As a result of the facts set forth herein and the timing of the Annual Meeting, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Under Maryland law, which governs the Court's futility analysis, demand is excused if a delay in awaiting a response to a demand would cause irreparable harm to the Corporation. Here, because the uninformed vote on the Charter amendments will cause irreparable harm to the Company, and there is insufficient time before the Annual Meeting to await a response from the Company to a demand and then secure relief from this Court in advance of the stockholder vote, demand is excused.

## COUNT I

### Individual and Derivative Claim Against the Individual Defendants
### For Violations of § 14(a) of the Securities Exchange Act in Connection with the Proxy

46. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

47. Plaintiff brings this claim individually on behalf of himself and derivatively on behalf of RFT.

48. Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

49. The Proxy violates § 14(a) and Rule 14a-9 because the Individual Defendants omitted material facts necessary to make the Proxy not false and misleading, specifically, the fact

that eliminating the Roll-Up Protections will facilitate an incipient Roll-Up Transaction with multiple AR Global-managed REITs.

50. The misrepresentations and omissions in the Proxy are material, and Plaintiff and the Company will be damaged if the Roll-Up Protections in the Charter are eliminated as a result of the incomplete and misleading information in the Proxy.

51. Rule 14a-4(a)(3), promulgated pursuant to § 14 of the Securities Exchange Act, provides:

> The form of proxy . . .
>
> (3) Shall identify clearly and impartially each separate matter to be acted upon, whether or not related to or conditioned on the approval of other matters . . .

17 C.F.R. § 240.14a-4(a)(3).

52. Rule 14a-4(b)(1) provides:

> Means shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to each separate matter referred to therein as intended to be acted upon . . .

17 C.F.R. § 240.14a-4(b)(1).

53. The Individual Defendants violated Rules 14a-4(a)(3) and 14a-4(b)(1) by causing the issuance of a Proxy which impermissibly bundles separate matters to be voted on. Specifically, Proposal No. 6 bundles two separate matters. In so doing, the Individual Defendants attempt to prevent Plaintiff from exercising his right to vote on each matter separately.

54. Plaintiff and the Company will suffer irreparable harm if the misleading and omitted information in the Proxy is not corrected and Proposal No. 6 in the Proxy is not unbundled to allow individual votes on the unrelated Charter amendments.

WHEREFORE, Plaintiff demands judgment as follows:

A. Enjoining the Annual Meeting unless and until the Individual Defendants cure the materially incomplete and misleading Proxy;

B. Granting appropriate equitable relief to remedy the Individual Defendants' violations of the federal securities laws;

C. Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: June 16, 2016

Respectfully Submitted,

GRANT & EISENHOFER P.A.

_/s/ Daniel L. Berger_
Daniel L. Berger
dberger@gelaw.com
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

KESSLER TOPAZ
  MELTZER & CHECK, LLP
Lee D. Rudy
lrudy@ktmc.com
J. Daniel Albert
dalbert@ktmc.com
Michael C. Wagner
mwagner@ktmc.com
Stacey A. Greenspan
sgreenspan@ktmc.com
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiff*